OPINION OF THE COURT
Loren Baily-Schiffman, J.
This holdover proceeding was tried before this court beginning on October 27, 2000 and ending on January 29, 2001. At *391 that time a schedule was set for posttrial submissions which were received simultaneously from petitioner and respondent on or about April 15, 2001. No request for permission to submit further briefs was received from any party and the matter was fully submitted with the receipt of the posttrial submissions.
Petitioner seeks eviction of the respondent and undertenants after the expiration of respondent Norton’s lease on September 30, 1999. Respondent Norton asserts defenses that he is a residential tenant entitled to Rent Stabilization Law protection on the basis that there are six or more residential units in the building; failure to comply with Multiple Dwelling Law § 325; failure to comply with RPAPL 741; estoppel; improper rent demand; and exercise of option to renew lease. Respondent has also counterclaimed for attorney’s fees.
Findings of Fact
By a lease dated August 5, 1996, tenant William Norton rented the entire fourth floor of the premises, 111 North 11th Street, in the Williamsburg section of Brooklyn, from the then owner, Meyer Teitelbaum. The lease is commercial in form and states that the premises rented are to be used as artists’ studios. A clause in the lease specifically prohibits living in the space. Despite this lease provision, tenant asserts, and the court finds, that the landlord rented the premises to tenant Norton with the knowledge and explicit consent that the premises were to be converted to several residential spaces.[1]
In fact, Mr. Norton immediately began the conversion of the fourth floor from raw space to residential use after signing the lease in August 1996. He began his residential occupancy of the space in 1996; however, the three other spaces that were created in the conversion were not used as residences until later. In October 1997, Norton received permission from Teitelbaum to install a shower and other fixtures in the space occupied by Doug Flamm. This work was done with the assistance of Teitelbaum’s employee, Marcus Durantt. The two other spaces on the fourth floor were made usable for residential occupancy in 1998 with the addition of bathroom plumbing and *392 fixtures, gas lines for a stove and overhead blower for heat. This work was also done with the assistance of Marcus Durantt. The four spaces on the fourth floor were occupied as homes by the following people: William Norton; Doug Flamm, later replaced by Margaret Brown; Ann Sonderling, later replaced by Tara Smith; and Steve Weiss, later replaced by Sarah Oakes.[2]
The court finds that at the time petitioner purchased the building, there were four residential spaces occupied on the fourth floor. The court also finds that the residential occupancy of the fourth floor was open and not surreptitious. The conversion was accomplished with the assistance of the building employees; the building’s elevator, operated by the landlord’s employee, was used to transport the accouterments of residential occupancy, including a six-foot-long bathtub for Mr. Norton; the doors to the fourth floor spaces were often kept open exposing the residential nature of the spaces to the building’s employees and visitors; and Mr. Norton had a number of conversations with the prior owner about the conversion to residential use, including where best to put the bedroom, the large bathtub Mr. Norton was so proud of and the “finished product” which included rooms on three levels. Mr. Teitelbaum saw the converted space when he visited the loft to examine the wall pointing done by his employees.
Tenant presented substantial testimony concerning other residential spaces in the building. James Sheppard testified that he and Dion Kliner signed a lease for the second floor of 111 North 11th Street in January 1997 similar in form to the lease signed by William Norton, i.e., a commercial lease with a specific prohibition on residential occupancy. Mr. Sheppard testified that he and Mr. Kliner had an understanding with the landlord that despite the form of the lease, conversion to residential occupancy would be permitted. In furtherance of this understanding, Sheppard and Kliner and Ediner’s wife, Darcy Mann, began the conversion immediately after signing the lease. Three residential spaces were created by these tenants with the knowledge and consent of the owner and some assistance from Marcus Durantt. The conversion was completed in January 1998.
*393 Mr. Sheppard testified that the petitioner was aware of the residential nature of the second floor prior to purchasing the building because prior to purchase, Anthony Fernicola, the principal of petitioner landlord, visited his space masquerading as a sprinkler inspector. During this visit, Mr. Sheppard first showed Mr. Fernicola the “middle space” occupied first by Sue Bannon and then by Joan Christian and Phillip Pond which was openly and unmistakably residential. Then Mr. Sheppard showed Mr. Fernicola his space, also openly and unmistakably residential, and then introduced Mr. Fernicola to Mr. Kliner at his door. Kliner testified that he showed Mr. Fernicola, the “sprinkler inspector,” through his space which was also openly and obviously residential.
Several other meetings with Fernicola were described by Mr. Kliner, some of which took place in the loft space and one at the restaurant owned by Mr. Fernicola in Williamsburg, the Northside. The meetings in the loft took place at Mr. KLiner’s dining room table, exposing the open kitchen-dining room area to view by Mr. Fernicola. Mr. Kliner also testified that Mr. Teitelbaum had visited the second floor loft space just after the lease was signed and at two points during the conversion. During the last visit, the kitchen, bedroom and bathroom in the rental space were completed and the other two spaces were under construction with walls up, bathrooms installed and gas and electric lines in.
Testimony was provided by Simon Obarzanek, pursuant to subpoena, concerning his residential occupancy of a space on the fifth floor from June 1998 to June 2000. The conversion of this space from commercial to residential was done by the tenant at the tenant’s expense. Mr. Obarzanek vacated this space after making a deal with Mr. Fernicola that involved a payment to Mr. Obarzanek of $15,000.
Both Tara Smith and Margaret Brown testified that Mr. Fernicola visited and was shown around their spaces prior to his purchasing the building.
The court finds that when the petitioner purchased the building, there were three residential spaces on the second floor and one on the fifth floor in addition to the previously mentioned four residential units on the fourth floor.
A word must be said about the testimony of the petitioner’s witnesses, in particular Mr. Fernicola and Mr. Teitelbaum. There was a distinct inability by these two witnesses to recall very much of anything relevant to the facts of this case. The testimony of these two men was equivocal, contradictory with *394 previous statements and, to this court’s view, disingenuous. The testimony evidences a distinct failure to ask questions that an owner or potential owner of a building would reasonably ask concerning the use of the building, particularly when presented with substantial construction in progress or when deciding whether or not to purchase a property. Respondent’s attorney posits that the reason why both Mr. Fernicola and Mr. Teitelbaum failed to ask questions about the use of the building is that they already knew that the building was being used residentially. Although this is a compelling argument, the court will not go so far as to assume knowledge denied by these witnesses. However, where contradictory testimony was given by petitioner’s and respondent’s witnesses, by and large the court finds the testimony on behalf of respondent to be more credible. In the court’s view, the tenant’s witnesses presented credible, consistent and complete testimony that was bolstered, not shaken, on cross-examination. The court cannot say the same for the petitioner’s fact witnesses.
Decision
The petition seeks eviction of respondent and the undertenants on the basis that tenant William Norton’s commercial lease expired on September 30, 1999; that respondent and the undertenants continued in occupancy after the expiration of Mr. Norton’s lease without permission of the petitioner; that the building is neither a multiple dwelling nor subject to city rent control or the Rent Stabilization Law of 1969, as amended (Administrative Code of City of NY, tit 26, ch 4); and that the building is located in an area zoned for commercial use only. For the following reasons the court finds that the building is a multiple dwelling; that the tenants are protected by the Rent Stabilization Law; that zoning is not a bar to rent regulation protection or residential occupancy; that the residential occupants are entitled to leases; and that the proceeding is dismissed for failure to file a multiple dwelling registration.
That the Lease is in a Commercial Form Does Not Require the Eviction of Respondents Where the Landlord Petitioner and His Predecessor Knew of and/or Consented to Residential Occupancy
The lease for the premises in question is an expired commercial lease. Were the court to apply the provisions of this lease, the petition would be granted and eviction ordered. Petitioner argues that rules of contract construction require that the lease terms be applied as written as they are clear and unambiguous. Respondent argues that the lease should *395 not be applied to permit this eviction proceeding because the landlord permitted residential occupancy of the premises or at the very least closed its eyes to it and, thus, waived its right to deny the residential occupancy and the rights and obligations that flow therefrom.
Notwithstanding petitioner’s argument as to what the rules of contract construction require, numerous courts have failed to apply clear and unambiguous lease terms prohibiting residential occupancy where the landlord knew of and consented to the residential conversion and/or occupancy of the premises. (Mandel v Pitkowsky, 102 Misc 2d 478 [App Term, 1st Dept 1979], affd 76 AD2d 807 [1st Dept 1980]; Metzendorf v 130 W. 57 Co., 132 AD2d 262 [1st Dept 1987]; 468-470 Ninth Ave. Corp. v Randall, 199 AD2d 13 [1st Dept 1993]; Tracto Equip. Corp. v White, NYLJ, Mar. 21, 1997, at 36, col 4, lv denied Apr. 30, 1997 [App Term, 2d Dept], lv denied June 5, 1997 [2d Dept], rearg denied NYLJ, Sept. 12, 1997, at 29, col 5 [2d Dept].) This court concurs with these decisions that where the landlord knew or closed his eyes to open and conspicuous residential occupancy, that knowledge is imputed to the landlord to prevent an eviction based solely on the wording of lease provisions that neither party to the agreement intended to comply with. The language of the Appellate Division, First Department, in two cases is instructive. In 468-470 Ninth Ave. Corp. v Randall (199 AD2d 13, supra) the Court stated:
“the units in question were converted to residential use in 1981. The owner’s blanket denial of knowledge of the conversions is insufficient to rebut the detailed affidavits submitted by the tenants demonstrating not only knowledge of and acquiescence on the part of plaintiffs principal in the residential use of the premises, but also his active encouragement and participation in the renovation process * * * summary judgment to defendant-cross appellant properly was denied.”
The Court went on to say the following in Metzendorf v 130 W. 57 Co. (132 AD2d 262, 265, supra):
“It is equally elemental that a landlord cannot rent premises under a commercial lease with full knowledge that the tenant intends to convert the premises to solely residential use as his primary residence, to thereafter knowingly permit such use for eight years, and thereafter avoid the protections afforded to residential tenants under the Rent *396 Stabilization Law and Emergency Tenant Protection Act.”
The trial of this matter elicited testimony that clearly demonstrates to this court that the prior landlord, Meyer Teitelbaum, rented the premises to William Norton with the understanding, knowledge and consent that Mr. Norton would convert the fourth floor premises to several residential spaces. Those conversions began immediately after the lease was signed; Mr. Teitelbaum and his employees visited the premises during and after this conversion and never objected in any way to the work that was being done. Thus, Mr. Teitelbaum waived his right to object to use of the premises in violation of the lease clause prohibiting residential occupancy or in violation of the applicable zoning. (Sol Apfel, Inc. v Kocher, 61 NYS2d 508, affd 272 App Div 758 [1st Dept 1947]; Ditmas Apts. v Coster, 196 Misc 728 [Sup Ct, Kings County 1949]; Al-El Corp. v Rapaport, 203 Misc 908 [NY City Mun Ct 1953].)
As previously indicated, the principal of petitioner landlord inspected the premises prior to his purchase by masquerading as a sprinkler inspector. During this masquerade, he visited several residential spaces in the building including substantially all of the second floor and at least one space on the fourth floor. In another visit prior to purchasing the building, Mr. Fernicola saw another residential space on the fourth floor. The knowledge of residential occupancy obtained in these visits and the failure to act on that knowledge by immediately taking steps to remedy this “illegal” use constitutes waiver, a conscious relinquishment of a known right. Moreover, the waiver by the prior owner is binding on the new owner by virtue of the lease having been assigned by the prior owner to the new owner:
“A landlord may waive any right he may have to insist that the premises shall be used only for the purposes specified in the lease and such a waiver is binding on his grantee or assignee.” (Sol Apfel, Inc. v Kocher, 61 NYS2d at 514, supra.)
By Virtue of There Being Eight Residential Units, the Building is Subject to Rent Stabilization Protection
Respondent asserts he is entitled to the protections of the Rent Stabilization Law and Rent Stabilization Code (9 NYCRR parts 2520-2530) as the building contains six or more residential units that were converted to residential use with the consent of the landlord and at the tenants’ expense. Petitioner counters that the building has a commercial certificate of oc *397 cupancy; was used strictly by commercial tenants prior to respondent Norton’s occupancy; and the conversion was completed after petitioner purchased the building without petitioner’s knowledge.
The court has already determined that the building contains eight residential units; that the units were converted to residential occupancy with the knowledge and consent of the prior landlord; that the petitioner, the present landlord, was aware of the residential occupancy at the time it purchased the building; and that the conversion was accomplished wholly at the tenants’ expense. Petitioner’s arguments are unavailing. Neither the commercial certificate of occupancy nor the fact that the premises were occupied by commercial tenants prior to respondent Norton’s occupancy is a bar to an application of rent stabilization protection. (Mandel v Pitkowsky, 102 Misc 2d 478, supra; Tracto Equip. Corp. v White, NYLJ, Mar. 21, 1997, supra.)
Moreover, the court has found as a matter of fact that the petitioner had actual knowledge of the residential nature of the tenancies prior to its purchase of the building. However, even if the court were to find that petitioner did not have actual knowledge of the residential occupancy at the time of its purchase, such knowledge is imputed to the petitioner by virtue of the principal’s refusal to visit the residential lofts prior to petitioner’s purchase of the building and/or the knowledge of the prior owner is imputed to the present owner. Whether the conversion to residential occupancy was completed prior to the petitioner’s purchase of the building is of no consequence. At the time the petitioner purchased the building there were eight separate units arranged for residential occupancy and actually occupied by residential tenants.
The system of residential rent protections in New York City is governed in large part by the Rent Stabilization Law of 1969 (hereinafter RSA) (Administrative Code § 26-501 et seq.), which applies to all buildings “containing six or more dwelling units” built after 1947 (Administrative Code § 26-504 [a]). The Emergency Tenant Protection Act of 1974 (hereinafter ETPA) (L 1974, ch 576, § 4, as amended; McKinney’s Uncons Laws of NY § 8622 et seq.) extended the coverage of the RSA to all housing units not previously covered by rent regulation.[3] The end result of this scheme is that all housing units are covered *398 by the ETPA unless specifically exempted (EPTA § 5 [a]; McKinney’s Uncons Laws of NY § 8625 [a]).
Petitioner argues that the premises are exempt from the ETPA by virtue of the fact that the rent charged to respondent Norton when he rented the entire fourth floor of the premises was more than $2,000 per month, citing section 6 of the Rent Regulation Reform Act of 1993 (L 1993, ch 253 [adding Administrative Code former § 26-504.2]). That section states that a “housing accommodation” for the purposes of New York City rent control:
“shall not include any housing accommodation with a legal regulated rent of two thousand dollars or more per month at any time between the effective date of this section and October first, nineteen hundred ninety three which is or becomes vacant on or after the effective date of this section.” (Administrative Code former § 26-504.2 [emphasis added].)
There is a fatal flaw in petitioner’s analysis. The Administrative Code section cited by petitioner refers to “legal regulated rent.” The reason for this is that the cited section concerns units that are already subject to some rent regulation, either rent control or rent stabilization. Only regulated units have a “legal regulated rent.” And only after a regulated apartment that rents for more than $2,000 is vacated does the unit become decontrolled. The rent charged to respondent Norton for the fourth floor is more than $2,000. But as this rent is not a “legal regulated rent” by virtue of the fact the unit has not been registered with the Division of Housing and Community Renewal nor has that agency set a “legal regulated rent” the Administrative Code section relied on by petitioner is inapplicable. The court declines to exempt the premises from the protections of the Rent Stabilization Law on the basis asserted by petitioner.
The building at issue contains more than eight residential units. These housing accommodations are not covered by the Loft Law or any prior rent control provisions and do not fall within any of the enumerated exemptions in section 5 of the ETPA. The eight residential units in the building are, therefore, subject to the Rent Stabilization Law and as such, are entitled to leases and to have a stabilized rent established.
Location of the Building in an Ml-2 Zoning District Does Not Prevent Rent Protection Coverage or Residential Occupancy
It is undisputed that the building in question is located in an Ml-2 zoning district which prohibits residential use. As a *399 result, petitioner argues, respondent is not entitled to rent protection as a matter of law and is subject to eviction. Respondent argues that the building’s location in a manufacturing district does not create an absolute exclusion of residential occupancy and does not preclude rent regulation (citing Tan Holding Corp. v Wallace, 187 Misc 2d 687 [App Term, 1st Dept]; 840 W. End Assocs. v Zurkowski, NYLJ, Feb. 21, 1991, at 24, col 4 [App Term, 1st Dept]; Ten Be or Not Ten Be v Dibbs, NYLJ, June 12, 1985, at 11, col 1 [App Term, 1st Dept]; Miller v Margab Realty, NYLJ, Apr. 11, 2001, at 19, col 2 [Sup Ct, NY County]; Matter of K & G Co. v Reyes, 52 Misc 2d 606 [Civ Ct, NY County 1966]).
The court is aware and takes judicial notice of the fact that residential occupancy in the Williamsburg neighborhood in which the subject building is located has been expanding into areas previously used for manufacturing purposes. Respondent has presented several variance applications in the Williams-burg neighborhood where the Borough President recommended an amendment of the zoning map to permit residential occupancy in a previously manufacturing district. The court is also aware that legislation has been introduced in Albany to extend some protection to residential occupants of previously manufacturing areas in Brooklyn, including Williamsburg.
The court’s analysis of this issue begins with Tan Holding Corp. v Wallace (187 Misc 2d 687, supra). There the Appellate Term, First Department, rejected the landlord’s argument that location of the building in an area zoned for manufacturing which prohibits residential occupancy creates a bar to rent stabilization protection. Petitioner landlord has argued herein as the landlord did in Tan Holding that the zoning resolution alone prevents the court from granting rent stabilization protection to the respondent.
This court, relying on the analysis in Tan Holding, holds that the zoning resolution does not create a bar to rent regulation. Respondent has established to the satisfaction of this court that zoning variances to permit residential occupancy have been granted in the area immediately surrounding the building in question and that the character of the neighborhood is changing towards one that is more residential. Petitioner’s argument that an owner of a building cannot be required to submit a variance application may be a correct statement of the law. However, in order to evict tenants who expended substantial sums of money to create residential units out of raw space with the knowledge, consent and assistance of *400 the landlord and his agents, the petitioner must show that reasonable efforts to legalize the building or correct the illegality have been made. (K & G Co. v Reyes, 52 Misc 2d 606, supra.) The court declines to hold as a matter of law what efforts would be reasonable in the context of this case. Suffice it to say that the present landlord has made no efforts to conform this building to the requirements of the law, other than its attempt to evict the residential tenants. Where the landlord had knowledge of, and his agents assisted in, the creation of the illegality that petitioner now asserts as the basis on which these tenants should be evicted, the petitioner must demonstrate to this court that the illegality cannot be cured without removing the tenant. There is no proof in the record whatsoever to satisfy this burden.[4]
Failure to File Multiple Dwelling Registration Prohibits Order Directing Payment of Rent and Requires the Dismissal of this Proceeding
This proceeding, brought in the commercial landlord/ tenant part, seeks the eviction of the respondent tenant and undertenants on the basis that their commercial lease has expired. The court has ruled above that the tenancy of the fourth floor that is the subject of this proceeding contains four separate residential, not commercial, spaces. The court has also ruled that there are four other spaces in the building that have been converted to residential use. The building is, therefore, a multiple dwelling within the meaning of Multiple Dwelling Law § 4 (7). The petitioner has failed to plead and/or prove at trial that a multiple dwelling registration has been filed for this building, as required by Multiple Dwelling Law § 325. It is also clear from the evidence that the residential oc *401 cupancy of this building is in violation of the certificate of occupancy and, thus, violates Multiple Dwelling Law §§ 301 and 302. Moreover, RPAPL 741 requires that a petition properly allege the multiple dwelling and rent regulation status of the building. The failure to allege a multiple dwelling registration where one is required compels the dismissal of this proceeding. Similarly, the failure to allege the rent regulation status of the building where the building qualifies for such status compels the dismissal of the proceeding. As petitioner has failed to plead and prove the filing of a multiple dwelling registration or registration of the unit with the Division of Housing and Community Renewal as rent stabilized, the petition is dismissed.
Petitioner also seeks the payment of use and occupancy. A motion seeking this relief was made during the course of the trial and the court reserved decision until after trial. The court now decides that no use and occupancy can be ordered by this court. The provisions of Multiple Dwelling Law §§ 301, 302 and 325 and the case law in this Department are clear that no rent or use and occupancy can be collected where an owner fails to obtain a proper certificate of occupancy or multiple dwelling registration. (Jalinos v Ramkalup, 255 AD2d 293 [2d Dept 1998].) The reasoning behind this rule is also clear and was well stated by Honorable Margaret Taylor in 40 Clinton St. Assocs. v Dolgin (126 Misc 2d 373, 375 [Civ Ct, NY County 1984]):
“It is the well-settled rule of the courts of this State that the prohibitions and penalties provided for by section 302 of the Multiple Dwelling Law are to be enforced. Thus, a landlord may not collect rents nor maintain a proceeding therefor where the multiple dwelling in question is occupied in violation of section 301 of the Multiple Dwelling Law requirement of a certificate of occupancy. (Waters v Panzella, 100 NYS2d 214; Carmel v Appleton, 127 NYS2d 268 [App Term, 1st Dept]; Guarino v Timares, 196 Misc 414, mot for lv to app den 276 App Div 847; Schwarzkopf v Buccafusca, 98 NYS2d 42 [App Term, 1st Dept]; Baum Residence Corp. v Van Rosson, 206 Misc 314 [App Term, 1st Dept].) This rule so enunciated is the expression of the appropriate recognition by the courts that the requirements of section 301 of the Multiple Dwelling Law, designed and intended to ensure that dwellings are safe and fit, can mean little if they are not enforced by recourse to the penalties provided in section 302 *402 of the Multiple Dwelling Law.”
The court finds that the building in question is a de facto multiple dwelling in that there are at least three families residing in separate units in the building in violation of the certificate of occupancy. Based upon Multiple Dwelling Law §§ 301, 302 and 325 and the case law previously cited, the petitioner’s claim for use and occupancy is denied in all respects.
In an order dated July 21, 2000 in this proceeding, Honorable Alice Fisher Rubin directed that respondent tenant pay use and occupancy to the petitioner without prejudice to the rights of the parties. As this court has ruled that no use and occupancy can be ordered, the court directs the petitioner forthwith to return to respondent all use and occupancy tendered in compliance with Justice Rubin’s decision.
Attorney’s Fees
Both petitioner and respondent have sought attorney’s fees. The court finds that the respondent is the prevailing party in this proceeding. The court also finds that the lease between respondent and the prior owner which has been assigned to the petitioner includes a provision, paragraph 55 of the lease rider, concerning attorney’s fees.

. The proceeding against named respondents undertenants Michael Shore, Steve Weiss, Cathy Forer, Marabeth Lund, Gina Companella, “John Doe” and “Jane Doe” is dismissed as the petitioner has failed to establish that these individuals occupied the premises at the time the petition was filed.

. It is conceded by the parties that the building is not covered by the Loft Law (Multiple Dwelling Law art 7-C).

. The decision in 302-304 Met. Assocs. v Butler (NYLJ, Jan. 3, 2001, at 21, col 1 [Sup Ct, Kings County]) requires some comment. The court held that a loft building could not be a de facto multiple dwelling where residential use is prohibited by the current zoning law. This case can be distinguished on the facts from the case at bar in that Justice Knipel found in Butler that the landlord had undertaken the residential conversion whereas here the tenants did the conversion at their own cost and through their efforts. Moreover, contrary to the holding in Butler, this court believes that pre-Loft Law authority is applicable to post-Loft Law cases such as the case at bar. There is substantial authority for this position both in the First and Second Departments. (Tracto Equip. Corp. v White, NYLJ, Mar. 21, 1997, supra; Tan Holding Corp. v Wallace, 187 Misc 2d 687, supra; Wilson v One Ten Duane St. Realty Co., 123 AD2d 198 [1st Dept 1987]; Metzendorf v 130 W. 57 Co., 132 AD2d 262, supra; Miller v Margab Realty, NYLJ, Apr. 11, 2001, supra; Etlin v Pepper, NYLJ, Apr. 26, 2000, at 30, col 5 [Civ Ct, Kings County].) Therefore, this court declines to follow the Supreme Court’s decision in Butler.